**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**SHIRLEY A. HAWKS,**

        **Plaintiff,**

**-vs-**                                      **Case No. 6:04-cv-1790-Orl-18KRS**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the Complaint filed by Shirley A. Hawks, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security disability benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration. Doc. No. 9. This matter has been referred to me for issuance of a Report and Recommendation pursuant to 28 U.S.C. § 636(b).

**I.    PROCEDURAL HISTORY.**

On February 20, 2002, Hawks filed an application for supplemental security income payments under the Supplemental Security Income for the Aged, Blind, and Disabled

Program (SSI), 42 U.S.C. § 1382, *et seq*., alleging she became disabled on September 9, 1999. TR. 91-93.[1] Hawks' claim was denied, initially and upon reconsideration.

Hawks requested a hearing before an administrative law judge (ALJ), which was held on March 23, 2004. Hawks, who was represented by an attorney, testified at the hearing. Vocational expert Joseph Agrusa also testified. TR. 28-63.

After considering the testimony and the medical evidence presented, the ALJ found that Hawks had not engaged in substantial gainful activity since her alleged disability onset date. TR. 16. The ALJ concluded that the medical evidence indicated that Hawks suffered from sickle cell disease, anemia, degenerative disc disease of the cervical spine and lumbar spine, asthma, and a depressive disorder. TR. 18. The ALJ determined that Hawks' impairments were severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations. TR. 18-19.

The ALJ found that Hawks had the residual functional capacity (RFC) to perform light work,[2] "with additional restrictions of being able to occasionally climb, stoo[p], and crouch, and frequently balance, kneel and crawl." TR. 19. The ALJ further found that Hawks "is to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards."

---

[1] Hawks alleged disability onset date was later amended to September 24, 2002. TR. 32.

[2] Pursuant to 20 C.F.R. § 404.1567(b), light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." The regulation further provides that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id*.

*Id*.  The ALJ concluded that "the evidence does not support [Hawk's] allegations of the intensity and persistence of . . . pain and other symptoms." TR. 20.  The ALJ further noted that Hawks' was "not fully credible regarding her allegations of being unable to do any type of work." *Id*.

In support of her findings, the ALJ detailed the opinions of several physicians who either treated Hawks or reviewed her medical records at the request of the SSA. TR. 20-24. Specifically, the ALJ noted that "five physicians, Dr. Broom, Dr. Gerber, Dr. Smith, Dr. Gerstenblitt, and Dr. Hate', have evaluated [Hawks] and none have found [her] disabled or prohibited [her] from working." TR. 24.

With respect to Hawks' psychological impairment, the ALJ found that she had "mild restriction of activities of daily living; mild difficulty in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation." *Id*.  The ALJ noted that the evidence indicated Hawks had responded to treatment, and she concluded that Hawks could "perform simple routine repetitive tasks." *Id*.

In closing, the ALJ found that Hawks was able to perform work that exists in significant numbers in the national economy. TR. 25-6.[3]  In reaching this determination, the ALJ relied upon the testimony of vocational expert Agrusa. TR. 26. Specifically, the ALJ

---

[3] The ALJ also concluded that Hawks' past relevant work as a produce bagger was within her RFC. TR. 27. However, because the record was unclear as to whether this particular job was substantial gainful activity, TR. 25, the ALJ continued through step five of the evaluation process.

found that Hawks was able to perform the following jobs: sales attendant; cashier; and ticket taker. TR. 26-7. Hence, the ALJ concluded that Hawks was not disabled. TR. 27.

Hawks requested review of the ALJ's decision by the Appeals Council. On November 18, 2004, the Appeals Council denied Hawks' request for review. TR. 5-7. This appeal timely followed. Doc. No. 1.

## II. JURISDICTION.

The ALJ's decision become the final decision of the SSA once the Appeals Council denied Hawks' request for review. *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. § 416.1481. This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383.

## III. STATEMENT OF FACTS.

A. *Hawks' Testimony*.

Hawks was born on October 26, 1959. TR. 34. She completed high school, and she attended a vocational cooking school. TR. 36. Hawks' previously worked as a produce bagger, line server, salad-bar attendant, and stockperson at a produce warehouse. TR. 36-40, 105-08.

Hawks suffered a back injury in September 1998, when she fell at work. Hawks received a worker's compensation settlement arising from this injury. TR. 42, 90.

Hawks had back pain every day. TR. 46. It sometimes radiated to her upper back and to her buttocks. TR. 47.

Hawks lived with her father. She did not have health insurance. TR. 47. On a typical day, Hawks rose at approximately 6:00 a.m. TR. 47. She was unable to perform routine

chores. TR. 48; 113. She needed help bathing and dressing herself. TR. 113. During the day, she watched television for about an hour. She would sometimes go outside, or visit one of her sisters. TR. 48, 53. She was able to drive a car. TR. 35. She did not have any hobbies. *Id*. She went to bed before 9:00 p.m., but she did not sleep well. TR. 48. She ordinarily got approximately three good hours of sleep a night due to pain and anxiety. TR. 48-49.

Hawks brought a cane to her hearing before the ALJ. Hawks explained that she used the cane to help with her balance. TR. 50. Hawks stated that she was unable to walk more than twenty feet using her cane without experiencing difficulty or pain. TR. 51. She could stand or sit for about fifteen minutes without experiencing difficulty or pain. She was unable to do any bending. *Id*. She could occasionally lift a gallon of milk. TR. 52.

About a year after she injured her back, Hawks began experiencing mental problems. She was depressed, and she cried a lot. TR. 41. Hawks further testified that she had "a lot of very bad mood swings." TR. 52. Hawks stated that she had trouble with concentration and focus. TR. 52.

B.  *Vocational Expert (VE) Testimony*.

The ALJ posed the following hypothetical, among others, to the VE:

> I'm first going to assume that I have an individual who is 44 years of age, has a high school education, and has the past relevant work experience as described for the Claimant . . . that she could lift 20 pounds occasionally, ten pounds frequently. Sit, stand, or walk for six hours of an eight-hour day. Occasionally climb, stoop, and crouch. Frequently balance, kneel, and crawl. Needs to avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, and hazards. Would such an individual be able to perform any of her past relevant work or any other work?

TR. 56.

With respect to the ability to perform past work, the VE responded that the only possible job would be produce bagger. TR. 56. However, if the claimant could not perform repetitive bending, the VE opined that she could not work as a produce bagger. TR. 58-59. Because Hawks only worked as a produce bagger for about three months, the ALJ was not sure that this constituted past relevant work experience. TR. 57

With respect to other available jobs, the VE responded as follows:

> If we were looking at other types of work that would fit within that hypothetical . . . we would look at jobs such as a sales attendant, identified as DOT code 299.677-010, light duty in physical demand, SVP level 2, making that unskilled work. The numbers in the Orlando MSA are at approximately 3,700, nationally in excess of 1.7 million. Another example of such an occupation meeting the hypothetical would be that of a cashier, identified as DOT code 211.462-010, light duty in physical demand, SVP level 2, making that again unskilled work. The numbers in the Orlando MSA are at approximately 7,300 and nationally at approximately 2.9 million.
>
> . . . .
>
> . . . Another example of a position meeting that hypothetical would be that of a ticket taker, identified as DOT code 344.667-010, light duty in physical demand, SVP level 2, unskilled work. The numbers in the Orlando MSA are approximately 1,850 and nationally in excess of 146,000.

TR. 57-58.

The ALJ then asked the VE to consider the following: "If I add to the hypothetical that the individual, due to her mental problems, could only perform simple, routine, repetitive tasks, would that change your response?" The VE responded: "It would not, your Honor. These are all SVP level 2, unskilled positions." TR. 58. The VE noted, however, that "for

any job, the person must have the ability to maintain their concentration on task." TR. 60.

   *C.   Medical Evidence*.

After her injury at work on September 3, 1998, Hawks was treated by Dr. Bookhardt and Dr. Chang. TR. 173. These treatment records are not before the Court.

On March 2, 1999, Hawks was admitted to Princeton Hospital after seeking emergency room treatment for severe anemia. TR. 133-34. The attending physician, Phuoc Pham, M.D., opined that Hawks suffered from anemia with very low hematocrit and hemoglobin. TR. 134. Dr. Pham also opined that Hawks had sickle cell disease, which accounted for the anemia. TR. 130. After four days of treatment, Hawks' condition improved, and she was discharged. *Id.*

In May 1999, Michael J. Broom, M.D., examined Hawks. At that time, she complained of constant back pain worsened with sitting and walking and left leg numbness and tingling. TR. 173. She rated her pain as the worst she had experienced in her life. Upon examination, Dr. Broom noted that Hawks walked with an antalgic gait. He did not observe muscle spasms. TR. 173. An MRI showed disc degeneration and protrusion. His assessment was back strain with disc protrusion. He recommended a home exercise program with use of a TENS unit. He opined that Hawks had reached maximum medical improvement, with a 6% impairment rating. He indicated that Hawks could return to work with restrictions of no lifting more than twenty-five pounds and no repetitive bending. TR. 172.

In August 1999, Hawks complained of very severe lower back pain on a consistent basis and she reported that her pain was a nine on a scale of one to ten. TR. 171. Mark

Gerber, M.D., who was associated with Dr. Broom, noted that this was "a very significantly high rating," and he opined that "it [was] somewhat out of proportion to the pathology seen in the lower lumbar spine." *Id*. Dr. Gerber was "surprised by the amount of pain [Hawks was] reporting." *Id*. His impression was that Hawks suffered from lumbar strain with persistent symptoms of lower back pain and a disc protrusion at L5-S1. Dr. Gerber agreed with Dr. Broom's assessment that Hawks could return to work at a light to moderate duty job, provided she refrained from lifting over twenty-five pounds and repetitive bending. TR. 170.

In September 1999, Hawks was examined by Richard C. Smith, M.D. At that time, she complained of lower back pain that radiated down her left leg with numbness and tingling. TR. 143. Upon examination, he noted that Hawks walked with an antalgic gait. He observed tenderness in the paraspinal muscles, and a straight leg raising test was positive for pain on the left side. TR. 145. MRI's of Hawks lumbar spine reviewed a midline annular tear at L5-S1 with a diffuse bulge contacting both S1 nerve roots and slightly displacing both S1 nerve roots. TR. 145. Dr. Smith's impression was that Hawks suffered from back pain, lumbago, sciatica, and an intervertebral disc disorder of the lumbar spine. He recommended continued conservative treatment and physical therapy. TR. 145. He wrote that if Hawks was not able to tolerate the pain, she would be a candidate for fusion surgery. TR. 146. He placed the following limitations on her work status: "No lifting over 10 lbs. No repetitive bending, pushing or pulling." TR. 146.

In October 1999, Hawks fell and struck her head and left shoulder. She sought treatment from Jeffrey Friedlander, M.D., a neurologist. TR. 160. Hawks complained of a continuous headaches since the incident, with pain radiating down her arms and legs and

numbness in her hands. She also reported tremendous difficulty sleeping following the accident. TR. 160.

Upon examination, Dr. Friedlander observed diminished sensation in Hawks' calves. She walked normally. TR. 161. He noted spasms in the cervical, lumbar and shoulder areas. His assessment was post traumatic continuous daily headaches, probably transformed migraine variety; acute cervical strain/sprain syndrome with myofascitis; and acute lumbar strain/sprain syndrome with myofascitis. He prescribed Lortab, a form of oxycodone, and Indocin,[4] along with physical therapy. TR. 162. Later in October, Dr. Friedlander administered trigger point injections to Hawks' paralumbar muscles. TR. 158.

Dr. Friedlander continued to treat Hawks until July 2000. TR. 149-162. Hawks consistently complained of neck pain, back pain, and headaches. TR. 151-58. An MRI taken in March 2000 reveled posterior disk herniations. TR. 163. On April 13, 2000, Dr. Friedlander noted that the injuries Hawks sustained in the October 1999 accident were permanent. He opined that Hawks had reached maximum medical improvement with a 15% impairment. TR. 154.

In June 2000, Dr. Friedlander continued to observed muscle spasms in Hawks' back and shoulder areas. TR. 151. Her gait was normal. TR. 151. His assessment was myofascial pain syndrome, episodic tension type headaches, and posterior disc herniations in the cervical spine confirmed by MRI. TR. 149, 151. After his last examination of Hawks

---

[4] Indocin is a nonsteroidal anti-inflammatory used to relieve some symptoms caused by arthritis, such as inflamation, swelling, stiffness and joint pain. *See* MEDLINEPLUS, DRUGS & SUPPLEMENTS, http://www.nlm.nih.gov/medlineplus/druginformation.html (last visited February 6, 2006).

in July 2000, Dr. Friedlander prescribed Indocin and Soma as needed for muscle spasms. He increased his assessment of her injury to an 18% whole body impairment rating.  TR. 150.

On November 15, 1999, Hawks was admitted at Orlando Regional Healthcare System due to a sickle cell crisis complicated by pneumonia.  TR. 147-48.

In May 2000, Dr. Gerber noted that Hawks' complaints of pain continued to be out of proportion to the objective findings.  She had functional range of motion.  Her reflexes remained decreased at the ankles and knees.  However, Dr. Gerber observed that Hawks could walk well without an assistive device.  TR. 167.  In June 2000, Dr. Gerber gave Hawks samples of Ultram, a pain medication, to see whether this would ease her pain.  TR.  165.

In January 2001, Hawks told Dr. Gerber that she had recently sought emergency room treatment for back pain.  Upon examination, Dr. Gerber observed that Hawks walked using a cane.  She appeared to be in mild to moderate discomfort.  He again prescribed Ultram.  TR. 164.  Dr. Gerber stated that he was unable to explain Hawks' "significant symptoms[,]" and that he believed they were "somewhat out of proportion to the objective findings . . . ."  TR. 164.

Hawks was treated by various physicians at the Pine Hills Health Center from January 2001 to February 2004.  TR. 217-25, 242-45, 254-58.  The records, which are difficult to decipher at times, indicate that Hawks suffered from low back pain, a bulging disc, lumbar disc disease/chronic back pain, hypertension (HTN), bronchitis/asthma, depression, and radiculopathy.  TR. 217, 219, 225, 244, 255-56.

In May 2002, Hawks was examined by Dan Gerstenblitt, M.D., at the request of the SSA. TR. 182-84. On the day of the examination, Hawks was 5'2 1/2" inches tall and weighed 182 pounds. TR. 183. Hawks indicated that she had back pain that was sometimes severe and which radiated down the left leg and sometimes the right leg. She also indicated that sometimes her left shoulder would be numb and she would have tremors and numbness in her right arm. She sometimes became short of breath due to pain. TR. 182.

Dr. Gerstenblitt noted that Hawks had a history of asthma, for which she used an inhaler. TR. 182. Upon examination, Dr. Gerstenblitt noted that Hawks had full range of motion. Her deep tendon reflexes were intact. When distracted, she was able to bend ninety degrees without difficulty, although when asked to perform this movement voluntarily, she held on to a table because she was afraid she would fall. He noted minimal tenderness in the lumbar area. She was able to walk without use of a cane. He also observed a tremor on her right side. TR. 183-84.

Dr. Gerstenblitt's impression was that Hawks suffered from chronic back pain, possible hypertension, and obesity. TR. 184. He opined that she was magnifying her pain and that she had "severely deconditioned herself due to her perceived complaints." *Id*. He recommended restrictions of no lifting greater than twenty-five pounds, avoiding frequent bending of the back greater than forty-five degrees and avoiding repetitive flexion at the waist. He indicated that Hawks did not need to use a cane or other assistive device. He further noted that she did not require any environmental restrictions. TR. 184.

On September 10, 2002, Hawks was treated at the emergency room of Orlando Regional Healthcare System for a "slip and fall." TR. 186-92. The attending physician's impression was that Hawks had degenerative joint disease (DJD) "in the lower lumbar spine with no acute bony abnormality evident," and "DJD involving the cervical spine with no acute bony abnormality apparent." TR. 189-90.

On September 23, 2002, Nitin Haté, M.D., examined Hawks' at the request of the SSA. TR. 193-95. Hawks complained of radiating back pain with numbness in her legs and shaking. She walked with an antalgic gait without an assistive device. TR. 193-94. Her physical examination was normal. TR. 194. Dr. Haté's impression was that Hawks suffered from chronic back pain. He opined that Hawks "may have some difficulty in very strenuous physical activities, particularly repetitive stooping and squatting, and lifting heavy weights." TR. 195.

Hawks received mental health treatment at Lakeside Alternatives from September 2002 through September 2003. TR. 205-16; 246-51. On November 8, 2002, Hawks underwent a psychodiagnostic examination that was performed by Susan Kessler, ARNP. TR. 208-10. Hawks reported that she felt sad all the time, cried a lot, suffered from panic attacks, heard voices, and suffered from hallucinations. TR. 208. Kessler opined that Hawks suffered from, among other things, major depressive disorder with psychotic features, polysubstance abuse by history, and certain psychosocial stressors. TR. 209.

Kessler further opined that Hawks had a Global Assessment of Functioning (GAF) score of 45.[5]  She was treated with medication. *Id.*

On March, 2004, one of a group of orthopaedic physicians examined Hawks for complaints of chronic lower back pain with numbness and burning in her right leg. On examination, she had some limitation in range of motion and a positive straight leg raising test. The examining physician noted that an MRI taken in March 2001 revealed an extruded spinal disc. A repeat MRI taken in February 2004 revealed a degenerative disk with mild bulging, a second bulging disk and some degenerative changes. TR. 259; *see also* TR. 226, 253. The physician's assessment was that Hawks' radiating pain was due to degenerative disc disease. TR. 259.

    D.    *Reviewing Professionals*.

On October 1, 2002, Keith R. Holden, M.D., reviewed Hawks' records and prepared a physical RFC assessment at the request of the SSA. TR. 197-204. He opined that Hawks could frequently lift ten pounds and occasionally lift twenty pounds. She could sit, stand or walk (with normal breaks) six hours a day. TR. 198. Her ability to push and/or pull was unlimited, but she could only climb, stoop or crouch occasionally. *Id*. She was to avoid

---

[5] The GAF scale is used to report an individual's overall level of functioning. A rating of 41-50 reflects:

> Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed. 1998) (SYNOPSIS OF PSYCHIATRY).

concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. TR. 201.

An unnamed individual also reviewed Hawks records and prepared a physical RFC assessment at the request of the SSA. TR. 174-81. This individual opined that Hawks could frequently lift ten pounds and occasionally lift twenty pounds. She could sit, stand or walk (with normal breaks) six hours a day. Her ability to push and/or pull was unlimited, and she could only climb or stoop occasionally. TR. 175-76.

## IV. STANDARD OF REVIEW.

To be entitled to Social Security disability benefits under SSI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). [6] The Act provides further that a claimant is not disabled if he is capable of performing his previous work or, if "considering his age, education, and work experience, [he could] engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to SSI benefits. In sum, when

---

[6] A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

-14-

evaluating a claim for benefits under SSI, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g., McDaniel v. Bowen*, 800 F.2d1026, 1030 (11th Cir. 1987).

This Court's review of a final decision issued by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the correct legal standards. *McDaniel*, 800 F.2d at 1029-30. While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

The Court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision. *Id*. at 1000. Even if the Court finds that the evidence weighs against the SSA's decision, it must affirm if the decision is supported by substantial evidence. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The Court

may not reweigh the evidence or substitute its own judgment for that of the SSA. *Id*. When reviewing a final decision issued by the SSA, this Court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**V.    ANALYSIS.**

Hawks raises three issues on appeal. She challenges the ALJ's decision that she could perform her past relevant work as a produce bagger. She asserts that the ALJ erred by failing to include in the hypothetical question to the VE her problems with concentration due to pain. Finally, she asserts that the ALJ and the treating and examining doctors did not adequately consider the functional limitations arising from her neck and cervical injuries. These are the only issues I will address.

*1.    Past Relevant Work.*

Hawks' contention that the ALJ erred by concluding that she could perform her past relevant work is based on a misreading of the ALJ's decision. In the body of the decision, the ALJ wrote as follows: "[I]t is not clear from the record whether the claimant performed this work [as a produce bagger] at substantial gainful activity levels, which would render it past relevant work. Further analysis is necessary." TR. 25. Therefore, the ALJ proceeded to step five of the sequential evaluation process.

Although the "Findings" set forth at the end of the decision state that Hawks' "past relevant work as a produce bagger did not require the performance of work-related activities precluded by her [RFC]," TR. 27, it seems clear from the analysis that the ALJ did not intend in this finding to render an opinion as to whether the job of produce bagger qualified as "past

-16-

relevant work." In any event, if Hawks could work at other available jobs, it is not necessary to determine whether the ALJ erroneously concluded that the produce bagger job was past relevant work.

### 2. *Hypothetical Question.*

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which compromises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). Hawks contends that the ALJ erred by failing to included in the hypothetical question to the VE that pain resulted in limitations on Hawks' ability to concentrate.

The record reveals that the ALJ considered the effects of pain on Hawks' ability to concentrate. The ALJ concluded that Hawks would have moderate difficulties in maintaining concentration, persistence or pace. TR. 24. She concluded that these difficulties would require that Hawks work only at "simple, routine, repetitive tasks." TR. 25. This restriction is consistent with a moderate difficulty in concentration, persistence or pace.

The ALJ included the limitation to simple, routine, repetitive tasks in the hypothetical question to the VE. The VE responded that, even with this limitation, Hawks could perform the jobs he identified. As such, the record reflects that the question posed to the VE adequately considered the functional limitations arising from moderate difficulties on Hawks' ability to concentrate.

### 3. *Failure to Consider All of the Evidence.*

Hawks contends that the ALJ failed to consider the functional impairments arising from the pain Hawks suffered as a result of her neck and cervical impairments. She relies

-17-

upon the March 2000, MRI, showing cervical disc herniations, which Dr. Friedlander acknowledged, as objective medical evidence of her neck and cervical impairments that support her complaints of neck pain.

The ALJ included degenerative disk disease of the cervical spine in the list of Hawks' severe impairments, citing Dr. Friedlander's medical records, among others, in support of that conclusion. TR. 18. In the report of his last examination of Hawks, Dr. Friedlander wrote that Hawks was experiencing neck soreness and stiffness with episodic tension type headaches that he was treating with medication. TR. 149.

The ALJ conducted the proper analysis of the functional limitations arising from pain. She articulated specific reasons supported by the record for her conclusion that Hawks' complaints of pain were not fully credible. These reasons included the opinions of Dr. Gerber and Dr. Gerstenblitt that Hawks' complaints of pain were magnified and disproportionate to the medical findings. It is significant to note that Hawks' does not contend that the ALJ erred in her credibility findings.

The ALJ considered the impairments arising from Hawks' neck and cervical injuries. She followed the pain standard in this circuit in assessing the functional limitations arising from pain due to all of Hawks' impairments. Substantial evidence in the record supports her credibility conclusions. For these reasons, Hawks' argument that the ALJ failed to consider all of the medical evidence is unavailing.

## VI.  RECOMMENDATION.

I respectfully recommend that the decision of the SSA be **AFFIRMED**.  I further recommend that the Court direct the Clerk of Court to enter judgment consistent with its Order on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on February 7, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
District Courtroom Deputy